## HOLLYWOOD v. STATE.

### (No. 654.)

CRIMINAL LAW—HOMICIDE—TRIAL—REPRESENTATION BY COUNSEL—CONTINUANCE—EVIDENCE — ADMISSIBILITY — RES GESTAE — DYING DECLARATIONS—CRIME COMMITTED BY ONE ENGAGED IN AN UNLAWFUL ACT—INSTRUCTIONS.

1. The constitutional right of a defendant in a criminal case to be represented by counsel includes a reasonable time within which to prepare for trial, but a motion to postpone the trial on the ground that sufficient time had not been allowed the defendant or his counsel to prepare for his defense is addressed to the sound discretion of the trial court, and a ruling denying the motion should not be disturbed on error unless it appears that the discretion of the court had been abused to the extent of depriving the defendant of his constitutional right.

2. Upon the facts, it was held that the defendant in a criminal case was not deprived of his constitutional right by the denial of a motion to postpone the trial on the ground that sufficient time before the date set for the trial had not been allowed the defendant or his counsel to prepare for his defense.

3. The defendant, who was accused of murder, and his two brothers had been in a saloon with the deceased, and the latter having become boisterous the defendant remonstrated, whereupon the deceased drew and pointed a revolver at the defendant in a threatening manner; thereupon defendant and his brothers left the saloon, the defendant going to his saloon and getting his loaded revolver, and afterwards the three returned to the saloon where the difficulty had occurred, and, meeting the deceased in front of the saloon, the defendant, with revolver in hand, assisted in attempting to disarm the deceased, who grabbed hold of the defendant's revolver, and during the scuffle the revolver was discharged, wounding the deceased and resulting in his death. *Held,* (1) That error was not committed in admitting the testimony of a witness, who heard a conversation between defendant and his brothers when they were returning to the place of the difficulty, that one of them told defendant he would get into serious trouble if he did not look out what he was doing, and that the defendant replied: "I don't care. I will shoot the paunch out of him," and when construed with the

other evidence, the testimony could not have misled the jury as to the one against whom the threat was directed. (2) Such testimony introduced by the state was competent, as tending to show malice and intent, essential elements of murder in the first or second degree. (3) The refusal to permit the defendant to prove that as a part of the same conversation he said to his brother: "We ought to disarm Bray, or he will hurt somebody," was not prejudicial or reversible error, since the defendant was convicted only of manslaughter, and thereby acquitted of murder in either degree, and manslaughter does not involve an intent to kill. (4) That the attempt of defendant to forcibly disarm the deceased in the manner shown by the evidence was unlawful, since the defendant was not an officer of the law, and the deceased was not engaged in committing a felony.

4 The defendant offered but was not permitted to show that between the first and second difficulty, he was looking for the marshal to take charge of the deceased. *Held,* that since the defense was not self defense, and the homicide was committed by the defendant when engaged in an unlawful act, and that the deceased, while apparently peaceably inclined, was called to the place of the homicide for the purpose of the commission of such unlawful act, the exclusion of such offered evidence was not prejudicial upon a conviction of manslaughter.

5. The defendant charged with murder having been convicted only of manslaughter, it was not prejudicial error to exclude a statement of the deceased made within half an hour after the shooting that he was sorry he was shot but it was his own fault, and he would not have the defendant arrested, intent not being an element of manslaughter, and other similar statements of the deceased made prior in point of time to the one rejected having been admitted, so that the rejected statement was merely cumulative, even though a part of the *res gestae.*

6. On the trial of defendant for murder, resulting in his conviction of manslaughter, the nurse, who attended the deceased before his death, testified for the state, over objection that it was not the best evidence, as to the symptoms of deceased from a chart that she had kept at the time, and at the close of her testimony the chart was offered in evidence and received, over defendant's objection that the best evidence had been given by the person who kept it.

*Held,* that the admission of the chart, though it may have been error, was not prejudicial, and was merely cumulative.

7. On the trial of defendant for murder, which resulted in his conviction of manslaughter, he offered to prove by the nurse, who attended the deceased after the shooting and before his death, that 36 hours before he died he said, when asked to take some nourishment: "It is no use. I am going to die in spite of hell. I want to tell you, Jack (meaning the defendant) was not to blame. It was all my fault." *Held,* that the evidence was properly excluded, for the reason that the dying declaration offered amounted merely to the statement of an opinion as to who was to blame, and not the statement of a fact.

8. Dying declarations, to be admissible in evidence, should consist only of facts, and not of conclusions, mental impressions, or opinions.

9. Where it appeared that a witness for the state had given evidence before the coroner's jury different from his answers upon the trial, it was proper to permit the state to propound leading questions to him as to his previous statements.

10. In a murder case the fact that the deceased had used opium or morphine is not a defense, even though the use of such drug may have contributed to the death of the deceased, unless it was the sole cause of the death, or death resulted from its use as a cause independent and distinct from the wound inflicted by the defendant; but if the wound was unlawfully inflicted and contributed mediately or immediately to the death, then the one who inflicted the wound is guilty.

11. Where the defendant in a murder case introduced evidence to show that the cause of the death of the deceased was not the wound inflicted by defendant, but hypostatic pneumonia caused by a weakened heart brought on by the use of morphine, it was proper on rebuttal for the state to inquire of a physician who was present at the post mortem, whether he saw any evidence that the deceased had used morphine by injecting needle points in the skin, and whether or not a state of coma or collapse such as had happened to the deceased the second day after the shooting was a common symptom about that time.

12. In a murder case an instruction was proper to the effect that it is incumbent upon the state to prove each of the material allegations of the information beyond a reasonable doubt, and if the state had done so, it was not neces-

sary that the other facts or circumstances surrounding such
testimony as had been given for the state should be es-
tablished beyond a reasonable doubt; that some of such
facts or circumstances may be established by a preponder-
ance of the evidence or may not be established; that all
that is necessary is that all the facts and circumstances
taken together shall establish the defendant's guilt beyond
a reasonable doubt, and if the jury are satisfied, beyond
a reasonable doubt, from all the evidence in the case, of
the defendant's guilt, they should find him guilty.

13. Where the defendant charged with murder and convicted of
manslaughter had shown by his testimony that the homicide
occurred in an attempt by him with a loaded gun in his
hand, and without warrant or authority, to disarm the
deceased, it was proper to instruct that if defendant, at the
time of the shooting, was attempting by power and force
and by the display of a gun in his hands and by pointing
it at the deceased, to cause the deceased to hand over to
defendant a gun that he (the deceased) then had upon
his person, such acts of defendant were unlawful; and if
the jury believe that the defendant was then engaged in
such unlawful act, and that while he was so engaged, the
deceased attempted to push or turn defendant's gun away
from him, whereby he was wounded, and that such wound
caused his death, then the defendant would be guilty of
manslaughter.

14. It is not error to refuse a requested instruction which is
fully covered by other instructions that are given.

15. It was proper upon the facts in the case to refuse an instruc-
tion requested by the defendant in a murder case to the
effect that if the jury believe beyond a reasonable doubt
that the shooting was accidental and not intentional, then
the homicide was excusable, and the defendant would not
be guilty, for if the defendant was engaged in an unlawful
act, which the evidence tended to show, then the homi-
cide would not be attributable to accident, since it would
not have occurred but for the unlawful act in which de-
fendant was engaged.

16. The accidental killing of a human being by another is not
a defense, unless caused in the doing of some lawful act.

17. An instruction requested in a murder case that if the gun-
shot wound inflicted upon the person of the deceased by
the defendant was not a mortal wound—"that is, was not
inflicted upon any portion of the body as would likely
cause death," and if the deceased came to his death from

some other or subsequent cause apart from said gunshot wound, then the defendant should be acquitted, was properly refused, by reason of the qualification of what constitutes a mortal wound.

18. The law of homicide makes no distinction as to the condition of health of the person whose life is taken, so long as the act of killing was unlawful.

19. The low vitality of a person may not enable him to withstand the shock or effect of a wound inflicted upon him, and such a wound may hasten his death, and if it does so, the one who is shown to have unlawfully inflicted the wound is guilty of homicide.

20. The jury in a murder case were instructed that they must find, beyond a reasonable doubt, in order to convict, that the gunshot wound, which was alleged to have caused the death of deceased, had caused or contributed to his death, and it was not error to refuse an instruction requested by the defendant that if the jury entertain any reasonable doubt as to whether the gunshot wound was mortal in itself, or reasonably calculated from its nature and extent to produce death, and whether death did ensue from hypostatic pneumonia to which the wound did not materially contribute, they should acquit the defendant.

[Decided January 12, 1912.]           (120 Pac. 471.)

[Rehearing denied April 1, 1912.]     (122 Pac. 588.)

Error to the District Court, Fremont County; Hon. Charles E. Carpenter, Judge.

John Hollywood was tried upon a charge of murder in the first degree, and convicted of manslaughter. He brought error. The material facts are stated in the opinion.

*M. C. Brown,* for plaintiff in error.

The motion for continuance should have been granted, for it was an abuse of discretion to deny the request of the defendant to postpone the trial to the next term of the court to enable him to prepare for his trial. There is no reasonable presumption that a defendant's motion for continuance at the first term after indictment is without merit, or made to obtain an unfair advantage. The affidavits clearly showed that the defendant and his counsel had no reasonable opportunity to prepare for his trial, and he was

therefore practically denied his constitutional right to the assistance of counsel. (State v. Pool, 23 So. 503; Dunn v. People, 109 Ill. 635; Wray v. People, 78 Ill. 212; Conley v. People, 80 Ill. 236; State v. Simpson, 38 La. Ann. 24; State v. Ferris, 16 La. Ann. 425; State v. Brooks, (La.) 1 So. 421.) The record discloses that questions were involved requiring the most careful examination and consideration by counsel, and sufficient time should have been given them to make proper preparation. (Kennedy v. State, 107 Ind. 144; State v. Boid, 37 La. Ann. 781; Lindville v. State, 3 Ind. 580; State v. Louis, 1 Bay, 1; Comm. v. Winnemore, 2 Brewst. 378; Hunt v. State, (Ga.) 27 S. E. 670; People v. Carlton, 5 Utah, 451; King v. State, 56 S. W. 926; Lackwood v. State, 22 S. W. 413; People v. Winthrop, 118 Cal. 85; Blackmore v. State, 76 Ga. 288; North v. People, 139 Ill. 81; State v. Deschamps, 41 La. Ann. 105.)

The testimony taken at the coroner's inquest or a record of such testimony is not competent as original testimony on the trial of the one charged with a homicide. Such record might be used to refresh the memory of a witness or to contradict him. It was error to admit over objection the testimony of the witness Adams with reference to a conversation overheard by him between the defendant and his brother. It did not appear by that testimony that the statements said to have been made by the defendant referred to the one alleged to have been killed by him, and therefore the admission of the testimony was prejudicial error. Much other testimony on direct and cross-examination was erroneously admitted over the objection of the defendant. The nurse who attended the deceased was permitted to state what his symptoms were, and following her testimony the chart which she had made during his illness was offered and admitted in evidence. These matters are referred to, not alone because the rulings of the court were erroneous, but because they tend to show that the defendant did not have a fair trial.

An expert witness may state the reasons for his opinion, and testify as to the source of his knowledge. He is therefore in a different position from other witnesses. He is permitted to express his opinion as to causes and effects, based upon the material facts either observed by himself or testified to by others, because of his special learning and knowledge as to the specific matter under inquiry. (5 Ency. Ev. 521-523; Ferguson v. Hubble, 97 N. Y. 507.) Because of the rules controlling the admission of testimony of expert witnesses the broadest latitude should be given in cross-examination. On such cross-examination it is proper to put questions in an abstract or theoretical form, for the purpose of testing the knowledge and information of the witness, and his competency to give the opinion which he may have stated. (People v. Augsbury, 97 N. Y. 501; R. R. Co. v. Edmanson, 135 Ala. 336; People v. Sutton, 73 Cal. 243; Beviar v. Delaware &c. Co., 13 Hun, 254; State v. Tighe, 27 Mont. 327; Ins. Co. v. Copeland, 86 Ala. 551; 5 Ency. Ev. 859.) The question of *res gestae* is squarely presented upon this record. There were several rulings relating to evidence of conversations occurring some minutes before the shooting, when the defendant was crossing the street. Defendant's counsel sought to bring out the whole of the conversations and other declarations made at the same time. The defendant had a right to the evidence under the ordinary rule of cross-examination. It was competent and relevant as part of the *res gestae*. (Louisville &c. Co. v. Samuels, (Ky.) 59 S. W.; Calley v. Comm., (Mo.) 12 S. W. 132; Means v. R. R. Co., 32 S. E. 960; 8 Tex. App. 254; State v. Bigerstaff, 17 Mont. 510; Monroe v. State, 5 Ga. 85; Sherley v. State, 144 Ala. 35; Stevenson v. State, (Tex.) 89 S. W. 1072; Feldin v. State, (Tex.) 3 S. W. 145; State v. Wagner, 61 Me. 178; Flinn v. State, 43 Ark. 289; R. R. Co. v. Chollett, 41 Neb. 578; Ins. Co. v. Mosley, 75 U. S. 307.) The rule is more liberal in cases of homicide than in civil cases. (State v. Hudspeth, 159 Mo. 178; Puls v. Grand Lodge, 13 N. C. 559.) Statements after

the act, even in narative, form *res gestae.* (Narley v. R. R. Co., 64 Miss. 329; 52 La. Ann. 727; Murray v. Boston &c. Co., 72 N. H. 32.) The tendency is to extend rather than to narrow the doctrine of *res gestae.* (Jack v. Mut. Res. Fund, 113 Fed. 49; State v. Harris, 45 La. Ann. 842; R. R. Co. v. McLane, 11 App. D. C. 220; R. R. Co. v. O'Brien, 119 U. S. 99; R. R. Co. v. Coly, 55 Pa. 402; Boat Co. v. Brackett, (U. S.) 30 L. Ed. 1049; Bergerman v. Ry. Co., (Mo.) 15 S. W. 994; Goss v. Ry. Co., 50 Mo. App. 622; Comm. v. McPike, 3 Cush. 181; Harman v. Stowe, 57 Mo. 93; Mattanson v. R. R. Co., 35 N. Y. 487; R. R. Co. v. Sutton, 42 Ill. 438; Land v. People, 104 Ill. 248; State v. Robinson, 12 Wash. 491; Freeman v. State, 40 Tex. Cr. 545; Alserver v. R. R. Co., 115 Ia. 338; Nutchum v. State, 11 Ga. 615; State v. Garrand, 5 Ore. 217; State v. McDaniel, 68 S. C. 384; Sullivan v. State, 58 Neb. 796; Wright v. State, 88 Md. 705.) There is no arbitrary time limit. (Johnson v. State, 8 Wyo. 494; Sullivan v. State, *supra.*) As to conclusions see also: People v. Swenson, 49 Cal. 338; State v. Foley, 113 La. Ann. 52; State v. Henderson, 24 Ore. 100; State v. Sloan, 47 Mo. 604.

To entitle a dying declaration to admission in evidence, it must appear that the declarant believed death to be impending and imminent, that the statement referred to the injuries which resulted in death, the person or persons who committed the injury, and the attending circumstances. Such statements differ from *res gestae,* in that they are admissible though usually made some time after the homicide elapsed, and are made *in extremis* and under a sense of impending death. (Kane v. Comm., 109 Pa. St. 541.) Statements admissible as *res gestae* are admissible as dying declarations. (State v. Nash, 7 Ia. 347; State v. Parigo, 80 Ia. 37; People v. Olmstead, 30 Mich. 431; Steel v. Baldwin, 79 Ia. 714; Simons v. People, 150 Ill. 66; State v. Scott, 12 La. Ann. 274.) The rule under which they are admitted is an exception to the rule which excludes

hearsay evidence, and the further rule requiring a witness to be sworn. (Kane v. Comm., *supra;* State v. Williams, 67 N. C. 12.) If the declaration was made under a sense of impending death it is admissible, no matter what the state of the declarant's mind was either before or after the making of the statement. (State v. Baldwin, *supra;* Small v. Comm., 91 Pa. St. 304; Polk v. State, 35 Tex. Cr. 495.) And the length of time after the statement before death is immaterial. (Swisher v. Comm., 26 Gratt. 963; State v. Mills, 91 N. C. 581; State v. Reed, 55 Kan. 767; State v. Kilgore, 70 Mo. 546; State v. Tilghman, 33 N. C. 513; Highsmith v. State, 41 Tex. Cr. 32.) The admission of the declaration does not depend upon the number of witnesses testifying upon the same matter. (Reynolds v. State, 68 Ala. 502; Linke v. Comm., (Ky.) 5 S. W. 354; 4 Ency. Ev. 937.) Dying declarations are admissible in behalf of the defendant. (People v. Southern, 120 Cal. 645; Rex. v. Scaife, 1 M. & R. 551; U. S. v. Taylor, 4 Cranch C. C. 338; Mattox v. U. S., 146 U. S. 140; Moore v. State, 12 Ala. 764; Brook v. Comm., 92 Ky. 183; Comm. v. Matthews, 89 Ky. 287; People v. Knapp, 26 Mich. 112; State v. Saunders, 14 Ore. 300.)

While this court will not disturb a judgment for an error which did not operate to the substantial injury of the complaining party, it is well settled that a reversal will be directed unless it appears beyond doubt that the error complained of did not and could not have been prejudicial. (R. R. Co. v. O'Brien, (119 U. S.) 30 L. Ed. 300.) After the plaintiff has introduced his evidence, and the testimony of the defendant has been heard, the plaintiff is not then entitled as a matter of right to introduce further proof in chief. (Walker v. Walker, 14 Ga. 242; Macullar v. Wall, 6 Gray, 507; Hathaway v. Hemingway, 20 Conn. 195; Pettibone v. Deringer, 4 Wash. C. C. 215.) The plaintiff can only give such evidence in rebuttal as tends to answer the new matter introduced by the evidence of the defendant. (Graham v. Davis, 4 O. St. 362.) But the court

may, in the exercise of a sound discretion, permit evidence in rebuttal that should have been offered in chief, when it is clear that the offer is not a device to obtain an unfair advantage. (Wheedlove v. Bundy, 96 Ind. 319; Clayes v. Ferris, 10 Vt. 112; Webb v. State, 29 O. St. 351.) But a repetition of evidence in chief has been rarely allowed in rebuttal. (Thompson on Trials, Sec. 343.) Instruction number 10 is frequently given in cases of circumstantial evidence, but where all the testimony was from eye-witnesses the instruction is out of place. (Welch v. State, 124 Ala. 41.) The instruction was misleading and uncertain. A new trial will be granted where the charge is ambiguous and the jury has been thereby misled. (Fain v. Cornett, 25 Ga. 184.) If an instruction is erroneous the court should go no further in the examination of the record, but the verdict itself should be presumed erroneous. (Young v. Pac. &c. Co., 1 Cal. 353; Chandler v. Fulton, 10 Tex. 2; Boyden v. Moore, 5 Mass. 438; Lane v. Crombie, 12 Pick. 177; James v. Langdon, 7 B. Mon. 193; Field v. Deatley, 10 B. Mon. 4.) When the court cannot see what effect the misdirection upon a material point may have had, a new trial should be granted. (Gains v. Buford, 1 Dana (Ky.) 481; Beaver v. Taylor, 1 Wall. 637; Bayless v. Davis, 1 Pick. 206; Wardil v. Hughes, 3 Wend. 418; Holmes v. Doane, 9 Cush. 135.) And this is the rule, although the evidence may seem to warrant the verdict. This court looked into the evidence in Gustavenson v. State, 10 Wyo. 300, but in that case no error was found in the instructions. Where testimony has been erroneously excluded the verdict will be set aside. (Potts v. House, 6 Ga. 324.) Instruction 16 was erroneous because it charges in positive terms that the pointing of the pistol at the deceased and attempting to disarm him were unlawful acts, and that in doing those things the defendant was engaged in committing an unlawful act. The instructions requested by the defendant correctly stated the law and should have been given.

*John Dillon,* County and Prosecuting Attorney, for the state.

The plaintiff in error was represented by two attorneys at the coroner's inquest, and had plenty of time and opportunity to gather all necessary testimony. The statement of the deceased to the nurse that the plaintiff in error was not to blame was purely a matter of opinion, and was not admissible as a dying declaration. (Sweat v. State, 107 Ga. 712, 56 L. R. A. 375-380.) Moreover, the exclusion of said statement could not have been prejudicial, for the reason that similar statements made by the deceased shortly after the shooting were admitted. The instructions which were given correctly stated the law, and many of them have been approved by this court. Counsel for plaintiff in error attacked particularly the instructions with reference to the attempt of the defendant to disarm the deceased. It is clear that the jury did not believe that the homicide was committed merely as the result of a friendly act on the part of the defendant to disarm the deceased. Upon the facts the jury were justified in finding that the motives of the plaintiff in error were not such as to justify the killing.

*M. C. Brown,* for plaintiff in error, on petition for rehearing, argued that the defendant was not committing an unlawful act in his attempt to disarm the deceased, and that the dying statement was admissible and erroneously excluded, citing, in addition to the authorities cited in the original brief, the following: State v. Ashworth, 50 La. Ann. 94; State v. Freeman, 1 Spears, (S. C.) 57; McLean v. State, 16 Ala. 672; State v. Gile, 8 Wash. 12; Walker v. State, 39 Ark. 221; Com. v. Matthews, 89 Ky. 287; Wroe v. State, 20 O. St. 464; Paine v. State, 61 Miss. 101; Powers v. State, 74 Miss. 777; Pierson v. State, 21 Tex. App. 14; Boyle v. State, 105 Ind. 469; Darby v. State, 79 Ga. 63; People v. Abbott, (Cal.) 4 Pac. 770; State v. Nettlebush, 20 Ia. 257; State v. Mace, 118 N. C. 124; Wagner v. Terr., (Ariz.) 51 Pac. 145; 10 Ency. L. (2nd Ed.) 382; Brotherton v. People, 75 N. Y. 159; People v.

Farmer, 77 Cal. 1; State v. Arnold, 35 N. C. 184; State
v. Foote, 24 Ore. 61; Baxter v. State, 15 Lea, 657.

SCOTT, JUSTICE.

The plaintiff in error (defendant below) upon a charge
of murder in the first degree was tried and convicted of
manslaughter, and brings error.

1. It is contended that the court violated defendant's
rights in compelling him to go to trial without sufficient
time for him or his counsel to prepare for his defense.
The crime is alleged to have been committed on the morn-
ing of September 30, 1909, at Thermopolis, Fremont county,
and 80 or 90 miles from Lander, the county seat and place
of the trial. The information was filed October 11th, fol-
lowing, and within 14 days of the regular November, 1909,
term of the district court within and for that county, and
served upon the defendant on October 26th. The defendant
was arrested on November 10th, and confined in jail until
November 17th, when he gave bail. On November 2nd, the
defendant having theretofore retained the firm of Landfair
& Hardin, Mr. Hardin of that firm went to Thermopolis
to interview the witnesses and prepare for trial. Having
arrived at Thermopolis, he was, on Nov. 3, subpoenaed as
a witness in a homicide case then being tried at Basin, the
county seat of Big Horn county, where he was detained
under process of the court until November 13th, whereupon
he returned forthwith to Lander, where he arrived on
November 16th, since which time he was engaged in the
trial of other cases and did not have the time to prepare
for defendant's trial. Landfair was called to an eastern
state, where he was a witness in the trial of a suit involving
his father's estate, and he could not devote any time to the
preparation of defendant's defense.

The bill shows that defendant had additional counsel in
the person of W. Waltman, Esq. The record shows his
presence throughout the trial. The motion was addressed
to the sound discretion of the court, and unless we can say
that the court abused its discretion to the extent of depriving

the defendant of his constitutional right of representation by counsel, and such right would include a reasonable time within which to prepare for the trial, we would not be authorized to disturb the judgment by reason of the court's ruling. We are unable to say from the record, that the defendant was prejudiced by the ruling. There is no showing of any absent witnesses or of newly discovered evidence, and we can not say as a matter of law that the time allowed for the defendant to prepare for his trial, *i. e.*, from Oct. 26th, when the information was served, until December 1st, when the trial commenced, although he was confined in jail from November 10th to 17th, on which latter day he was admitted to bail, was insufficient as upon the facts set up in the affidavits the court found contrary to defendant's contention. The defendant was not confined in jail so as to deprive him of an opportunity of preparing for trial, nor was Hardin his only counsel, but as he says in his motion, his chief counsel. There was nothing to prevent him, insofar as the record discloses, from counseling and consulting with his attorney Waltman, even if he was prevented from doing so with Hardin & Landfair by reason of their absence. The case appears to have been tried on his behalf with consummate skill and ability, and we can find no prejudice to him by reason of the denial of his motion for a continuance.

2. The evidence tends to show that the defendant and his two brothers, together with the deceased, had spent a part of the night of September 29, 1909, in a saloon, and between 6 and 7 o'clock in the morning, while leaving the saloon and while all were under the influence of intoxicating liquor, Bray, the deceased, was boisterous, whereupon the defendant remonstrated and Bray in an ugly mood drew and pointed his revolver in a threatening manner at the defendant. Thereupon the defendant backed off and he and his brothers left the scene of the quarrel, Bray re-entering the saloon, and the former going to his saloon nearby and getting his loaded revolver, and the three brothers shortly thereafter returned to the saloon. Bray was not then in

the saloon but soon after was seen passing along the side-
walk across the street and Onnie, one of the defendant's
brothers, in an undertone spoke to defendant, drew his
revolver, and went to the door of the saloon, called to Bray
across the street telling him to "come over and not be sore."
Bray came across the street and Onnie stepped out of the
door of the saloon onto the sidewalk with revolver in hand.
He (Onnie) says he didn't know where Bray was going
at the time he called to him, but as he (Bray) stepped on
the sidewalk he reached for his revolver and he (Onnie)
drew his gun on him and told Bray to put up his gun, and
having Bray covered he told Larry, who, having followed
him to the front door to take his (Bray's) gun. The de-
fendant then drew his revolver, went out of the saloon and
took part in the attempt to disarm Bray. The defendant,
with revolver in hand, having approached sufficiently near
Bray, the latter grabbed hold of the revolver and attempted
to wrench it from the hand of defendant, and during the
scuffle and while in defendant's hand, the revolver was dis-
charged, inflicting a wound in Bray's knee, from which
wound Bray lingered for several days and died.

One Adams, a witness for the state, testified over ob-
jection, that he heard defendant and his brothers talking
while they were returning to the place of the difficulty, and
that Larry told Jack (the defendant) he would get himself
into serious trouble if he didn't look out what he was doing,
and the latter responded: "I don't care, I will shoot the
paunch out of him." It is objected that this evidence did
not identify the deceased as the one against whom the
threat was made. It must be construed in connection with
the other evidence. The witness further testified that he
saw the Hollywoods, following this remark, walk down
the street to and into the Bank saloon, and that shortly
thereafter he saw the Hollywoods and the deceased stand-
ing on the sidewalk in front of the saloon, and that he then
walked down that way, but before he reached them and
was 100 feet away, he heard a gun shot, and going closer
saw both deceased and defendant hold of a revolver. We

think the court committed no error in admitting this evidence. It was sufficiently connected in point of time and place with the pre-existing trouble and was immediately followed by the infliction of the wound, and the circumstances pointed unerringly to deceased as the object of the threat. The question was for the jury, and it could not have been misled as to whom the threat was directed against. The defendant's acts spoke as clearly as words as to whom he had reference and the state was entitled to the evidence.

With reference to this conversation the defendant while testifying in his own behalf was questioned. The questions were objected to and sustained, whereupon the defendant offered to prove that he said to his brother, Larry Hollywood: "We ought to disarm Bray· or he will hurt somebody." Whereupon Larry replied: "Whatever you do, don't get into trouble," it being further stated in this offer "That if the prosecution is entitled to part of the conversation between these parties at that time, the defense is entitled to all the conversation, * * * for the reason that his conversations at that time tend to show the malice and intent." Objection to this offer was sustained. The part of the conversation introduced by the state was competent as tending to establish the element of malice and intent to take the life of the deceased,· upon the issue of first and second degree murder and, upon which charges the defendant was then on trial. He was acquitted of these degrees and found guilty of manslaughter, a lesser degree of the crime charged. Manslaughter under our statute is defined as follows: "Whoever unlawfully kills any human being without malice express or implied, either voluntarily upon a sudden heat of passion, or involuntarily, but in the commission of some unlawful act, or by any culpable neglect or criminal carelessness, is guilty of manslaughter, and shall be imprisoned in the penitentiary not more than twenty years." (Sec. 5793, Comp. Stat.) It will be observed that involuntary manslaughter does not involve an intent to kill. In Ross v. State, 8 Wyo. 351, 57 Pac. 924, it was held by this court that an error in defining murder in the

first degree was harmless when defendant is found guilty of murder in the second degree, unless the misdirection in some way affected the verdict. In Downing v. State, 11 Wyo. 86, it was again said that upon an indictment charging murder in the first degree, a conviction for murder in the second degree will not be reversed for an erroneous instruction as to premeditated malice in murder in the first degree unless the misdirection in some way influenced the jury in arriving at the verdict. The intention to disarm the deceased for fear that he might hurt somebody may have proceeded from the best of motives, but at the time the attempt to do so was made the deceased was not engaged in committing a felony, nor was he menacing any one, nor was the defendant an officer of the law and so authorized to disarm him. It is not pointed out nor do we discover from the bill that he denied the threat as testified to by the witness, Adams, and the offer was to prove as a part of the conversation something in addition to and as a part thereof which was left out by the state. With or without this evidence as offered, the attempt to forcibly disarm Bray in the manner as disclosed by the evidence was unlawful, and we are unable to understand how the defendant could have been prejudiced upon the issue of manslaughter by its exclusion.

3. The defendant offered, but was not permitted to show, that between the first and second difficulty, while he was away from the place of the homicide, that he was looking for the marshal to take charge of Bray. In view of the fact that the defense was not self-defense and the homicide was committed by the defendant while engaged in an unlawful act and that Bray, while apparently peaceably inclined, was called to the place of the homicide for the purpose of committing such unlawful act, we are of the opinion that the exclusion of this evidence was proper, or at least not prejudicial upon a conviction of manslaughter, as it would only have borne upon the question of his intent.

4. It is urged that the defendant was not permitted to show certain statements made by Bray and within half an

hour after the shooting, and after he had been assisted
from the sidewalk into the saloon, addressed to defendant,
in which he said in effect, "I am sorry I got shot, it was
my own fault. I won't have you arrested." It is claimed
that this was a part of the *res gestae,* and falls within
the rule of Johnson v. State, 8 Wyo. 494, 506. In that
case the deceased said when shot: "Oh, Johnson, you have
shot me," and within a half hour after being carried into
the house, upon inquiry as to how it occurred, he stated:
"Johnson (defendant) shot me, but he did not intend to do
it." It was held that the latter sentence might be considered
a continuation of the former and was admissible as a part
of the *res gestae* and that its exclusion was error. In that
case the defendant was convicted of murder in the second
degree where malice and intent were material elements to
be proven. This court said: "We think the evidence
should have been admitted. The shooting was confessed,
and the sole issue involved, in the charge of murder, was
the intent of the defendant." The facts of that case are
very similar to those in the case before us, except that the
defendant here was acquitted of murder, but convicted of
manslaughter. The inapplicability of the law of that case,
where intent to kill was the essence of the crime, and the case
here, where the crime of which the defendant was found
guilty was complete without such intent, is apparent. We
need not, however, base our ruling on this reasoning alone,
for there was evidence of several witnesses before the jury
of the deceased having made statements to the same effect
while on the sidewalk before and after the deceased was
assisted into the saloon and which were made prior in point
of time to those which were rejected. The ruling com-
plained of was with reference to evidence which was cumu-
lative even though a part of the *res gestae.*

5. The professional nurse who nursed the deceased the
last few days before his death, testified as a witness on
behalf of the state. She was permitted, over objection, to
refresh her memory as to deceased's symptoms from a chart

kept by her during the time she was employed. It was insisted by the defendant that if these symptoms were to be regarded that the chart was the best evidence. At the close of her testimony the state offered the chart in evidence. It was received over defendant's objection "that the best evidence has been given by the person who kept it." We are of the opinion that the admission of the chart in evidence, though it may have been error, was not prejudicial. It was merely cumulative of the witness's testimony and could in no way have prejudiced the defendant.

6. · The defendant offered to prove by the same witness that 36 hours before his death the deceased was feeling badly and she was trying to get him to take nourishment, and he said: "It is no use. I am going to die in spite of hell. I want to tell you Jack (meaning the defendant) was not to blame. It was all my fault." The state objected to the evidence so offered on two grounds, first: That the witness had violated the rule theretofore made by the court excluding all witnesses from the court room during the trial, and, second: that the proffered declaration was an opinion and not the statement of a fact. The objection was sustained. It is not shown that the defendant was in any wise responsible for the violation of the rule and the question upon this assignment must be determined upon the competency of the evidence offered.

It is contended that the declaration is in the nature of an opinion, and not the detailed statement of facts. "Opinions in dying declarations are inadmissible. It is indispensable that the dying declaration should consist only of facts, and not of conclusions, mental impressions or opinions." (Underhill Cr. Ev. 136; Sec. 294 Whar. Cr. Ev. (9th Ed.); Wharton on Homicide, (3rd Ed.) Sec. 629; 1 Bish. New Cr. Proc. (4th Ed.) Sec. 207, *et seq.;* 1 Greenleaf Ev. (Redfield's Ed.) Sec. 159.)

The courts are not in harmony as to what constitutes an opinion and what constitutes the statement of a fact within the rule stated, although all seem to agree that the

statement by the declarant of conclusion founded upon an inferred as distinguished from an actual fact within his knowledge is objectionable. The rule in that respect is clearly stated in House v. State, 94 Miss. 107, 48 So. 3, 21 L. R. A., N. S. 840, wherein the court say: "To us the true and proper test as to admissibility is whether the statement is the direct result of observation through declarant's senses, or comes from a source of reasoning from collateral facts. If the former, it is admissible; if the latter it is inadmissible." In that case there was a question of identity of the party who fired the fatal shot. In State v. Wright, 112 Iowa, 436, 445, 84 N. W. 541, the dying declaration to the effect that the deceased stated that he did not think the defendant intended to shoot him, and, further, that he thought defendant was crazy, was offered and rejected. The ruling was sustained. The court say: "Declarations made under the solemn sense of approaching death are only competent as to facts which the witness might testify to if living." The case was followed in State v. Sale, 119 Iowa, 1, 4, 92 N. W. 680, where a dying declaration to the effect that the defendant was not to blame for the difficulty and that he had to do what he did was rejected. In State v. Fielding, 135 Iowa, 255, 112 N. W. 539, the court sustained a conviction as against a complaint that the trial court permitted proof of a dying declaration of deceased to the effect that defendant deliberately shot her on the ground that the statement involved, first, an assertion of the fact that it was defendant who shot her; and, second, as to the manner, and attendant circumstances of the shooting, "that it was intentional and not accidental."

In People v. Alexander, 161 Mich. 645, 649, the court in speaking of dying declarations say: "The universal rule as established by the courts, is that such declarations may not include narration of matters not immediately connected with the fatal occurrence, and may not state mere opinions or conclusions when such opinions or conclusions would not be admissible from the lips of a living witness." The

court cites the following in support of this statement, *viz:* 10 Am. & Eng. Ency. L. (2nd Ed.), p. 382 *et seq.;* 21 Cyc. p. 975; People v. Olmstead, 30 Mich. 431; Note to Worthington v. State, 56 L. R. A. 353 (92 Md. 222, 48 Atl. 355); note to State v. Meyer, 86 Am. St. Rep. 637 (65 N. J. L. 237, 47 Atl. 486). In Mulkey v. State, 113 Pac. 532 (Okl.) a dying declaration in the following language was admitted in evidence over objection. The declaration in part was: "John Mulkey shot me without warning, foully murdered me without warning." It was held proper for the court to admit in evidence the words "John Mulkey shot me without warning," but that the objection should have been sustained as to the words "foully murdered me without warning," on the ground that the latter words was the expression of an opinion. In Moeck v. People, 100 Ill. 242, the defendant offered in evidence the dying declaration of the one on whom he had inflicted a fatal wound exonerating him from any blame in the affair. The offer was rejected and the supreme court in sustaining the ruling say: "Under the decision in the case of Adams v. People, 47 Ill. 376, they were not admissible as evidence. It was there said: 'The dying declarations of deceased, that he did not wish accused hurt for· what he had done, and that accused had done only right,' etc., affords no evidence of anything more than a truly 'Christian spirit of one who had been unjustly done to death, and who, in his dying agonies, was willing to forgive the malefactor." Without discussing the question further, we are of the opinion that the dying declarations here offered amounted to an opinion only as to who was to blame. That was practically the question that the jury had to find from the evidence. There was no question of identity and the facts surrounding the commission of the homicide wer before the jury by the evidence of eye witnesss and the question as to who, if anyone, was at fault or criminally responsible was for the jury. We are all the more readily led to this conclusion for the reason that we are unable

to find any decisions that hold that a dying declaration in the words of the one here presented is competent evidence, but on the contrary, the universal holding seem to be the other way. (Ratterton v. State, 53 Ga. 570; Sweet v. State, 107 Ga. 712, 33 S. E. 422; State v. Sale, *supra;* Haney v. Com., 5 Ky. L. Rep. 203; State v. Harris, 112 La. 937, 36 So. 810.)

7. Leading questions were propounded to Dr. Hamilton, a witness for the state, upon his direct examination. It appears that he had given evidence before the coroner's jury different from the answers to questions propounded to him upon the trial. The court permitted the state, over objection, to examine him as to his previous statements. The ruling of the court was proper and is sustained. (Arnold v. State, 5 Wyo. 439; Horn v. State, 12 Wyo. 131, 132, 40 Pac. 967; Sec. 774, Wigmore on Ev.)

Questions were also propounded to Dr. Hamilton, who attended deceased during his last illness and who made the post-mortem examination, upon cross-examination as to whether he found any symptoms or evidence of deceased having been addicted to the use of morphine. Objections to these questions were sustained. The defendant, by his counsel, then made the following offer, *viz:* "We will show that said witness is a physician and surgeon, and testifying as an expert on cross-examination, also that he was the attending physician in charge of Mr. Bray preceding his death. We wish to show by this witness that the use of opium or morphine is one of the causes for hypostatic pneumonia." The offer was rejected. All of the offer except the last sentence was already in evidence. The use of opium or morphine by the deceased was not a defense, even though it may have contributed to the death of deceased, unless it was the sole cause of the death, or that death resulted from the use of morphine as a cause independent and distinct from the wound. The law is that if the wound was unlawfully inflicted and contributed mediately or immediately to the death, then the one who so inflicted the

wound is guilty. (2 Bish. New Cr. L., Secs. 636, 637; Clark's Cr. Law, 128, 129.) The offer was not sufficiently broad to make the evidence admissible, for its competency was not then disclosed to the court, and the extent of the cross-examination with reference to collateral matters, in order to test the knowledge of the witness as an expert, was within the discretion of the court, an abuse of which we think the record fails to disclose. After this defense was developed by defendant's evidence, the witness might have been recalled for further cross-examination, but this was not done.

8. Dr. Safely having theretofore testified as a witness for the state, was called in rebuttal and permitted, over objection, that the evidence was not proper in rebuttal, to answer the following questions: "Q. Doctor, in your examination of the deceased at the post-mortem, did you see any evidence of this man Bray having used morphine by reason of his injecting needle points, or spots in the skin showing that? A. No. Q. Doctor, I will ask you whether or not in your opinion, as a physician, a state of coma or collapse, such as happened to Bray at the end of the second day, whether that is not a very common symptom occurring about that time? A. It is." Doctors Richards and Kenney testified as witnesses on behalf of the defendant that they were present at the post-mortem examination, and the former was called in consultation with Dr. Hamilton on the third day after the wound was inflicted, when the deceased was in a state of collapse or coma. Both testified that in their opinion death resulted not from the effect of the wound but from hypostatic pneumonia, caused by a weakened heart which was brought on by the use of morphine. This evidence was new evidence brought into the case by defendant's witnesses. The evidence of Dr. Safely was rebuttal and properly admitted. (Horn v. State, 12 Wyo. 80, 73 Pac. 705.)

9. By instruction No. 10, given at the request of the state, over defendant's objection, the court pointed out the

material allegations of the information and told the jury that it was incumbent upon the state to prove each of them beyond a reasonable doubt and if the prosecution had done so it was not necessary that the other facts or circumstances surrounding such testimony as had been given on behalf of the state "should be established beyond a reasonable doubt. Some of such facts or circumstances may be established by a preponderance of evidence or may not be established. It is not meant that it is incumbent upon the prosecution to establish every fact surrounding such testimony, as given beyond a reasonable doubt. All that is incumbent upon the prosecution is that all facts and circumstances taken together should establish the defendant's guilt beyond a reasonable doubt. If you are satisfied beyond a reasonable doubt from all the evidence in the case, of the defendant's guilt, you should find him guilty." This instruction was approved in Horn v. State, 12 Wyo. 80. In that case the state relied largely upon circumstantial evidence, while in this case the homicide was established by the evidence of eye witnesses. We do not understand that this court limited the instruction to cases resting upon or held that it was an instruction upon circumstantial evidence. The reason in support of giving it is as applicable when the prosecution rests upon direct as upon circumstantial evidence. There are many minor details and facts that enter into the evidence in every prosecution and which go to prove the ultimate essential elements of the crime charged. This court said in the Horn case (at page 153, 12 Wyo.) : "It is not true that the prosecution is bound to establish beyond a reasonable doubt every minor circumstance given in proof as tending to establish the main or ultimate fact essential to conviction." It would not be incumbent upon the court to so instruct. We are of the opinion that the instruction was proper and that the court committed 'no error.'

10. Instructions Nos. 16½, 17 and 18 were given at the request of the state over defendant's objection. They are as follows : "The court instructs the jury that if they

believe from the evidence in this case beyond a reasonable doubt that defendant at the time of this shooting was engaged in the act of attempting by power and force and by the display of a gun in the. hands of defendant, and by pointing said gun at deceased, to cause deceased to hand over to him, defendant, a gun that he, deceased, had then and there .upon his person, then the court instructs the jury that these acts of defendant were unlawful and that in their commission defendant was engaged in the commission of an unlawful act."

Instruction No. 17. "The court instructs the jury that if they believe from the evidence, beyond a reasonable doubt, that at the time . of the shooting, defendant was engaged in the act of attempting, by power and force and by the display of a gun in the hands of the defendant, to cause deceased to hand over to him, defendant, a gun that the deceased had then and there upon his person. And if the jury further believe from the evidence, byond a reasonable doubt, that this attempt by power and force and by the display of, a gun on the part of the defendant, with the intention to cause deceased to hand over to him, defendant, a gun that the deceased had then and there upon his person, to be an unlawful act, and the jury further believe that while defendant was engaged in this act, the gun in the hands of defendant was involuntarily discharged and deceased was shot and wounded by reason of said discharge; and the jury further believe that this wound, so caused, was the cause of the death of deceased, then this jury will find the defendant guilty of the crime of manslaughter."

Instruction No. 18. "The court instructs the jury that if they believe from the evidence, beyond a reasonable doubt, that defendant, at the time of this shooting, was engaged in the act of attempting by power and force and by the pointing of a gun in the hands of defendant at deceased, to cause deceased to hand over to defendant a gun that he, deceased, had then and there upon his person; and if the jury further believe that defendant was engaged

in the commission of an unlawful act, by this attempting by power and force and by the pointing of a gun in the hands of defendant at deceased, to cause deceased to hand over to defendant a gun that he, the deceased, had then and there upon his person; and the jury further find that while defendant was engaged in this act, deceased attempted to push or turn said gun in the hands of defendant away from the deceased; and that by reason of this act of deceased, said gun was discharged and deceased was wounded thereby; and the jury further believe that this wound, so caused, was the cause of the death of the deceased, Smith Bray, then this jury will find defendant guilty of the crime of manslaughter."

As applied to the facts and considered together, these instructions were not misleading or prejudicial. The defendant testified as a witness and his own testimony showed that the homicide occurred in an attempt without warrant or authority to disarm his victim. Sec. 5898, Comp. Stat. 1910, is as follows: "Whoever draws or threatens to use any pistol, dirk, knife, slung-shot, or any other deadly or dangerous weapon, already drawn, upon any other person, shall be fined in a sum not more than one hundred dollars, to which may be added imprisonment in the county jail not more than six months; Provided, That the provisions of this section shall not apply to a person drawing or threatening to use such dangerous or deadly weapons in defense of his person or property, or in defense of those entitled to his protection by law." This section was adopted from the criminal code of Indiana and has entered into prosecutions for homicides in that state before and since its adoption here. (Lange v. State, 95 Ind. 610; Surber v. State, 99 Ind. 71.) The evidence tended to show that the defendant was in the commission of an act inhibited and declared to be a crime by this section of the statute, and if the jury so found, then the defendant was engaged in an unlawful act. It was properly left to the jury by instruction No. 16½ to find or determine the existence of

certain facts, and if established by the evidence to their satisfaction beyond a reasonable doubt, then the defendant, as a matter of law, was engaged in the commission of an unlawful act. It is true that the instruction is without qualification, but upon the evidence it needed no qualification. The defendant's evidence showed that he was engaged in an act for which there was no legal excuse or justification. The defense was not self-defense. Upon the evidence, had that defense been urged, it could not be sustained. The defendant tried his case upon the theory that he had a right to forcibly disarm Bray. The jury could reasonably infer from the evidence that the latter was called to the scene of the homicide pursuant to an understanding between defendant and his brothers for the purpose of forcibly taking his revolver from him. By the first sentence of instruction number 17 the question of facts as to what the defendant was engaged in doing at the time the homicide occurred was again left to the jury. By the second sentence, to which objection is here made, the jury were told that if they further believe from the evidence beyond a reasonable doubt the matter set forth in the first sentence "to be an unlawful act," etc. It is perhaps true that the words "as already defined" would have made the instruction more complete, but it clearly appears from these instructions, and we think the jury must have understood, that for the purposes of the prosecution there could be no unlawful act except upon the proof thereof to their satisfaction beyond a reasonable doubt. The instructions were to be considered and construed together and in the light of each other and the jury were so instructed. So construed, we fail to understand how the jury could in any way have been misled. The whole trend of these instructions taken together left the question of finding upon the facts to the jury, which if found in a certain way would establish in law an unlawful act, for they were in effect told if certain facts were established from the evidence to their satisfaction, beyond a reasonable doubt, the law would regard the

defendant as being engaged in an unlawful act at the time the homicide was committed.

11.   Error is assigned upon the refusal of the court, at defendant's request, to give the following instruction numbered 30: "You are instructed that it is not necessary that the defendant should establish to your mind beyond a reasonable doubt that he is innocent; neither is it necessary that he should establish his innocence by a preponderance of evidence; the law is that if, upon the whole evidence, there exists in your mind a reasonable doubt of his guilt, then it is your bounden duty, under your oaths to give the defendant the benefit of that doubt, and to find him not guilty."

The jury were instructed by No. 9, given, that if, after a careful and candid consideration of all the evidence, they had a reasonable doubt that the defendant was guilty of any of the degrees of the crime charged, or of the crime of manslaughter, or if they had a reasonable doubt as to the cause of the death of the deceased, it would be their duty to return a verdict of not guilty, and by instructions 12 and 13 the jury were told that the burden of proof was upon the state to prove the defendant's guilt beyond all reasonable doubt and that the presumption of innocence attended the accused throughout the trial until that was done. · The refused instruction, we think, was fully covered by these instructions which were given, and for that reason the court did not err in refusing to give it.

12.   The court refused to give the following instruction, requested by the defendant, *viz:* Instruction No. 31. "The court instructs you that if you believe from the evidence, beyond a reasonable doubt, that the defendant, John Hollywood, about the time alleged in the information, did shoot, and did thereby wound the ·deceased, Smith Bray, and you further believe from the evidence that such shooting was accidental and not intentional upon the part of the defendant, then and in that event the homicide is excusable; and if you so believe from the evidence, or if you

have a reasonable doubt thereof, then you will find the defendant not guilty." This instruction was properly refused, for if the defendant was engaged in an unlawful act, which the evidence tended to show, then the homicide would not be attributable to accident, for the latter would not have occurred but for the unlawful act in which the defendant was engaged. The accidental killing of a human being by another is not a defense unless caused in the doing of some lawful act. (Johnson v. State, 94 Ala. 35, 41; Henderson v. State, 98 Ala. 35; Jenkins v. State, 82 Ala. 25; People v. Steubanvoll, 62 Mich. 329, 28 N. W. 883; Reddick v. State, (Tex. Cr. App. Nov. 23, 1898) 47 S. W. 993.)

In State v. Benham, 23 Iowa, 154, 92 Am. Dec. 417, 421, an indictment for murder, the evidence tended to show that the defendant pointed a loaded gun at the deceased, a scuffle ensued, during which the gun was discharged and killed the deceased. The court say: "If * * * the defendant pointed a loaded gun at the deceased, under such circumstances which would not have justified him in shooting the deceased, and the deceased seized it and struggled for it to save himself from the menaced injury from it, and in the struggle it went off without being purposely shot off by the defendant, the latter could not claim that the homicide was excusable. It would be manslaughter, and the circumstances relied on wholly to excuse the defendant would be regarded by the court in affixing the amount of punishment. The converse of the last proposition would, of course, be true, viz: that if the defendant pointed a loaded gun at the deceased, and it went off, under the circumstances in which it would have been lawful to have shot it off, the defendant would be regarded by the law as being guilty of no offense." (See also Jenkins v. State, 82 Ala. 25, 2 So. 150.) Upon the facts the instruction was properly refused.

13. The following instruction was requested and refused, viz: Instruction No. 34. "That if you find there

was a gun-shot wound upon the person of Smith Bray, inflicted by the defendant; and that it was not a mortal wound, that is, was not inflicted upon any portion of the body of Smith Bray as would likely cause death, and, if you believe from the evidence that said Smith Bray came to his death from some other or subsequent cause, apart from said gun-shot wound, then I charge you it is your duty to acquit the defendant." The court properly refused this instruction by reason of the qualification of and what constitutes a mortal wound. If given, the jury would have been told that the wound was not mortal unless inflicted upon a part of the body as would likely cause death. The place of the wound, its extent and severity were proper matters to be considered by the jury in determining the cause of death, but the instruction goes farther and ignores the physical condition or vitality of the deceased. The low vitality of a person may not enable him to withstand the shock or effect of such a wound as was inflicted on Bray, or even one of less severity, and such a wound might hasten his death and thus shorten his life, and if it did so the one who is shown to have unlawfully inflicted the wound is guilty of homicide. (State v. Johnson, 102 Ind. 247.) The law makes no distinction as to the condition of health of the person whose life is taken, so long as the act of killing was unlawful. (Sec. 638, 2 Bish. New Cr. Law; Clark's Cr. Law, 128.)

14. Error is assigned upon the refusal of the court to give the following instruction, numbered 35: "The court instructs the jury that if you entertain any reasonable doubt as to whether the gun-shot wound was mortal in itself, or reasonably calculated from its nature and extent to produce death, and whether death did ensue from hypostatic pneumonia, and to which the wound did not materially contribute, then you should acquit the defendant." There was no error in the refusal to give this instruction, for the jury were told in an instruction given that in order to convict they must find beyond a reasonable doubt that the gun-shot

wound caused or contributed to the death of the deceased, and unless so satisfied they should find the defendant not guilty.

We find no prejudicial error in the record, and the judgment will be affirmed.               *Affrmed.*

BEARD, C. J., and POTTER, J., concur.

## ON PETITION FOR REHEARING.

SCOTT, JUSTICE.

The plaintiff in error has filed a petition for a rehearing. No new question is here presented for our consideration, but it is sought to have this court again review the questions discussed in the opinion filed.

It is urged.that the court failed to pass upon the alleged error of the court in permitting the official stenographer to identify under oath a complete transcript of the evidence taken and given at the coroner's inquest. The transcript was not offered in evidence. This alleged error was not made a specific ground in the motion for a new trial, and for that reason it was not discussed in the opinion filed nor need it be here discussed.

In support of the petition, among other grounds, it is earnestly insisted that the court reached an erroneous conclusion as to the inadmissibility of the dying declaration of the deceased. We are aware that there is some difficulty in fixing the line as to what constitutes an opinion and therefore inadmissible, and what constitutes the declaration of an evidentiary fact and admissible as a dying declaration, assuming, of course, that the foundation has been properly laid. The rule was stated in the opinion in the precise language used in House v. State, cited therein. We confess that we had much difficulty in reaching the conclusion and only after a thorough examination of cases on the brief and others which were not cited were we enabled to reach a conclusion satisfactory to all the members of this court. In view of the earnestness of the eminent counsel for plaintiff in error, we have again examined the record and the

cases cited in the brief in support of this motion and are not convinced that any good purpose would be served by granting the motion.

We are therefore of the opinion that as there are no questions here presented which were not discussed upon the briefs and in the opinion filed, that a further discussion is unnecessary. The petition will be and is hereby denied.

*Rehearing denied.*

BEARD, C. J., and POTTER, J., concur.